1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10    JAMALL S. BAKER,                         CASE NO. C21-361 MJP

11                          Plaintiff,         ORDER ON REPORT AND
                                               RECOMMENDATION
12           v.

13    TAMMY O'REILLY, et al.,

14                          Defendants.

15

16          This matter comes before the Court on Plaintiff's Objections to the Report and

17    Recommendation of Magistrate Grady J. Leupold (R&R), (Dkt. No. 191), Plaintiff's Motions to

18    Supplement his Objections to the R&R (Dkt. Nos. 194, 200), Defendants' Objections to the R&R

19    (Dkt. No. 195), Plaintiff's Motion for the Court to Consideration Additional Case Law (Dkt. No.

20    201), and Plaintiff's Motion to Consider Medical Records (Dkt. No. 204). Having reviewed the

21    R&R, the Objections, the Motions, Responses (Dkt. Nos. 199, 202, 203), and all supporting

22    materials, the Court ADOPTS in part and OVERRULES in part the R&R, GRANTS Plaintiff's

23

24

1  Second Motion to Supplement his Objections, GRANTS Plaintiff's Motion to Consider Medical

2  Record, and DENIES Plaintiff's Motions to Consider Additional Case Law.

3  **BACKGROUND**

4  Plaintiff Jamall S. Baker is an inmate confined to the Monroe Corrections Center—

5  Special Offender Unit (MCC-SOU) who brings claims under 42 U.S.C. § 1983 against a number

6  of current and former DOC employees at MCC. Baker alleges that he suffered a "campaign [of]

7  harassment" on account of advocating for himself and others at MCC-SOU, particularly through

8  the grievance process, and that he had his First Amendment and Fourteenth Amendment Due

9  Process rights repeatedly infringed. (Fifth Amended Complaint (FAC) ¶¶ 13-15 (Dkt. No. 127).)

10 He asserts First Amendment and Due Process claims arising out of: (1) being terminated from

11 his kitchen job as retaliation for lodging grievances against correctional officers at MCC; (2)

12 being unable to meet privately with counsel; (3) having his legal mail opened outside of his

13 presence; and (4) having certain mail rejected as containing sexually-explicit images. (FAC ¶¶

14 74-91.) And he identifies four causes of action: (1) retaliation in violation of the First

15 Amendment; (2) violations of his First Amendment right to confer confidentially and privately

16 with counsel; (3) violations of a due process right of privacy under the Fourteenth Amendment;

17 and (4) violations of his First Amendment right of access to the courts. (Id.)

18 Defendants have moved for summary judgment, and Magistrate Judge Leupold issued a

19 Report and Recommendation that the Court: (1) deny the motion as to Baker's kitchen job

20 retaliation claim; (2) grant the motion as to Baker's attorney visitation claims; (3) grant the

21 motion as to the opening of legal mail; and (4) grant the motion as to the rejection of mail

22 containing explicit images. (R&R (Dkt. No. 190).) As noted in the R&R, Baker did not oppose

23 summary judgment on the latter two claims, and Baker voices no opposition as to this portion of

24

the R&R. But Baker objects to the R&R's conclusions as to his attorney visitation claim. And Defendants object to the R&R's conclusions as to Baker's kitchen-related claims. The Court therefore reviews the facts relevant to the two claims in dispute.

**A.    Retaliatory Firing From Kitchen Job**

Baker alleges he lost his job in the MCC-SOU kitchen because he exercised his First Amendment right to file grievances and complaints against MCC-SOU correctional officer staff. There are number of facts to review relevant to the claim.

It is undisputed that Baker lost his job after Defendant Lily Harris, a correctional officer (CO) who worked in the kitchen, claimed Baker engaged in "on-going problematic behaviors" and gave him an infraction on June 25, 2018 for yelling and disobeying orders. (FAC ¶ 21; see id. ¶¶ 17-18.) CO Hoskins also issued an "incident report" concerning the events of the same day, stating that he witnessed Baker disobey Harris's orders and that Baker was slow to comply with Hoskins' orders to leave the kitchen. (See Ex. 1 to the Declaration of Lily Harris (Dkt. No. 165-1 at 4).) Three days after Harris infracted Baker, Defendant Kathryn Grey, the Mental Health Unit Supervisor, terminated Baker "as a result of the infraction written by defendant Harris." (Declaration of Jamall S. Baker ¶ 9 (Dkt. No. 180); FAC ¶ 25.) The Parties present divergent facts as to what actually happened on June 25, 2018, and whether Harris's infraction was intended as retaliation.

Baker has provided competent evidence Harris falsified the grounds she used to infract him on June 25th. In his declaration, Baker explains that on June 25, 2018, Harris asked him whether he would be submitting his two-week notice to resign from his position in the kitchen, as he had apparently earlier indicated he might. (Declaration of Jamall S. Baker ¶ 3 (Dkt. No. 180 at 21).) When Baker explained he would not be resigning, Harris "appeared to become

1   agitated and started to yell at [him]." (Id.) Harris "then called Officer Hoskins and stated to him:

2   'I want you to witness this conversation.'" (Id. ¶ 4.) According to Baker, Harris "winked at

3   Officer Hoskins" and then "began to yell at [Baker] again and accused [Baker] of being a racist."

4   (Id.) Two other inmates who witnessed the interaction support Baker's version of the facts. First,

5   Gerald D. Collick avers that "Baker did not yell or scream at Mrs. Harris" and that "Harris did

6   make reference to [Baker] being a racist." (Declaration of Gerald D. Collick (Dkt. No. 180 at

7   34).) Similarly, Kyle Stoddard avers that "Baker did not yell or disobey a direct order" and that

8   "Harris was the one that was yelling." (Declaration of Kyle Stoddard (Dkt. No. 180 at 36)

9   (capitalization altered).)

10          Defendants have provided competing evidence regarding the incident on June 25th.

11   Through her declaration, Harris maintains that "Baker became verbally aggressive and

12   accusatory toward [her]" and he "refused [her] direct order to leave the kitchen." (Declaration of

13   Lily Harris ¶ 5 (Dkt. No. 165).) Harris avers she "wrote an infraction on Mr. Baker because he

14   was being disruptive and refused a direct order to leave the inmate kitchen." (Id.) She also states

15   that Baker ignored "numerous directions [from CO Hoskins] to go back to his unit" and that

16   Hoskins had to radio for an escort to remove Baker. (Id.) Hoskins wrote a report about Baker's

17   behavior that same day, which largely affirms Harris's statements. (Ex. 1 to Harris Decl. (Dkt.

18   No. 165-1 at 4).) Defendants have not, however, provided a declaration from Hoskins. And

19   Baker disputes that Hoskins gave him orders or that he disregarded any. (Harris Decl. ¶ 12.)

20          Baker has also provided competent evidence that Harris acted with a retaliatory intent,

21   notwithstanding Harris' denial. (See Harris Decl. ¶ 4.) Baker claims Harris falsely wrote up the

22   infraction because he had filed grievances against supervisory staff in the kitchen in 2017,

23   including a lawsuit against Harris's friend, Jerald Grant. (FAC ¶¶ 21-24.) The record also shows

24

1  that Baker filed a grievance against Harris in March 2018, in which he claims Harris engaged in

2  racism and discriminated against him on account of being African American when she refused to

3  give him back his lead job in the kitchen. (Dkt. No. 200-2 at 14.)[1] Baker avers that he filed the

4  March 2018 grievance after Harris terminated him from his "job as lead in the inmate kitchen."

5  (Baker Decl. ¶ 5.) Baker believes Harris terminated his job once she "found out that [Baker] was

6  suing her friend Gerald [sic] Grant." (Id.) According to Baker when he complained about losing

7  his lead role, Harris "stated to me that if I wanted my job back, I should drop the suit against

8  Grant, and then she laughed." (Id.)

9         Baker also points out that after he was terminated, correctional officer Sutherland told

10  him "I know, you were fired because you are suing everybody." (Baker Decl. ¶ 7.) The record

11  before Magistrate Judge Leupold contained a grievance Baker wrote about Sutherland's

12  comment, and a response from a grievance coordinator, Lee Stemler. (Dkt. No. 180 at 30.)

13  Stemler wrote that Sutherland "admits saying it," but that he "said [it] in a joking manner." (Id.)

14  The R&R concludes that Sutherland "had no knowledge of the situation," though the citation is

15  to Defendants' briefing, not evidence. (R&R at 9 (citing Dkt. No. 181 at 4-5).) With their

16  objections to the R&R, Defendants have newly submitted a declaration from Sutherland.

17  Sutherland admits he made the statement, but avers that "[i]n July of 2018, [he] had no

18  knowledge of why Mr. Baker was fired from his prison job" and that he has never learned the

19  reason he was fired. (Declaration of Lenville Sutherland ¶¶ 4-6 (Dkt. No. 196).) Sutherland also

20

---

21  [1] This document was filed with Baker's Second Motion to Supplement Plaintiff's Objections to
    the R&R. (Dkt. No. 200.) Although Defendants object to the supplemental briefing, they do not
22  object in any way to the additional supporting evidence. (See Defs. Resp. to Pl. Second Mot. to
    Supplement (Dkt. No. 202).) The Court considers the grievance, as there is no doubt as to its
23  authenticity and because it is explicitly referenced in Baker's declaration that was submitted in
    opposition to Defendants' Motion for Summary Judgment. (Baker Decl. ¶ 5 (Dkt. No. 180 at
24  22).)

1  admits, though, that he "do[es] not remember these events very clearly because this incident

2  occurred over five years ago." (Id. ¶ 4.)

3          Baker has also submitted an Investigative Report from the Office of Corrections Ombuds

4  (OCO Report) that closely examined at the incident and DOC's investigation into Baker's

5  grievances filed after he lost his job. (Baker Decl. ¶ 6 (Dkt. No. 180 at 21-28); id. at Ex 4 (OCO

6  Report) (Dkt. No. 180 at 38-51).) The OCO Report identifies evidence relevant to retaliation,

7  though the OCO "could not substantiate the allegation of retaliation due to lack of evidence."

8  (Dkt. No. 180 at 40 (also "acknowledg[ing] that retaliation is often difficult to prove in a

9  corrections setting and that lack of evidence does not mean that retaliation did not occur").) First,

10  the OCO Report notes that Baker "had filed DOC grievances against kitchen staff since 05/2017

11  in relation to unfair treatment, discrimination/racism, and concerns of state misconduct." (OCO

12  at 2 (Dkt. No. 180 at 39.) Second, the OCO report noted that Baker had otherwise been given no

13  infractions from 2013 until the June 25th infraction from Harris, and just prior to incident he had

14  been commended for his good work, having achieved the highest pay level. (OCO at 12.) Third,

15  the OCO found substantial flaws in how DOC investigated Baker's grievance surrounding his

16  termination, concluding that "the investigative process was improperly done, biased, violated

17  confidentiality and violated other procedural expectation" and that "the report was significantly

18  flawed, contained opinion, was missing information and was conducted by an investigator

19  [Defendant Grey] that was not impartial." (OCO at 3.) The flaws in the investigation included,

20  among other things, Grey's questioning of witnesses Stoddard and Collick in front of Harris and

21  Hoskins. This information remains relevant to the question of retaliation that the Court considers.

22

23

24

**B.     Attorney Visitations**

Baker claims that his First Amendment right to visit with counsel privately was infringed upon on three occasions. First, Baker avers that on July 24, 2019, Defendant correctional officer Sonia Mills sat in a visitation room while Baker met with counsel to discuss legal matters and that she was within earshot. (Baker Decl. ¶ 13; see also FAC ¶¶ 36-40.) He alleges that this was done in part to retaliate against him for his lawsuit against Jerald Grant. (FAC ¶ 40.) Second, Baker avers that on October 28, 2019, Mills again sat in the visitation room with him, and when he complained, Mills stated she knew she was violating his constitutional rights but that she "did not care." (Baker Decl. ¶¶ 14, 19; see also FAC ¶¶ 41-44.) Third, Baker avers that Defendant correctional officers Camden Crouse and Christine Pratt impeded his ability to meet confidentially with counsel when Crouse and Pratt sat in the visitation room, and that this was done in retaliation for his lawsuit against Jerald Grant. (Baker Decl. ¶¶ 20; see also FAC ¶¶ 45-48, 55-56.) Baker has explained that the visitation room is small, the correctional officers sat nearby, and conversations are easily overheard. (Baker Decl. ¶¶ 13-14, 17, 18.) He also asserts that as a result of Crouse and Pratt's presence, he became "emotionally distraught and signed papers without reading them and became so upset that [he] left the meeting without fully speaking with [his] attorneys." (Id. ¶ 22.) Baker avers that "by not being counselled by [his] attorneys, [he] lost a case that had merit." (Id.)

It appears uncontested that for each of the three meetings the named correctional officers were present in the visitation room with Baker and his counsel. After the third incident in December 2019, Baker filed a grievance, claiming that Pratt and Crouse had improperly been in the visiting room, rather than monitoring the meeting from outside through the entryway window. (Dkt. No. 180 at 85.) Defendant Grey investigated the grievance and claimed after

reviewing "pertinent policies, procedures, RCW's, appropriate records/forms, correspondence, kites, etc." that she found "Policy 150.150 is vague about staff presence during attorney visits but Mariam Dominique-Kastle, Law Librarian, and Lieutenant John Richards both advised that staff should remain behind glass to observe attorney visits." (Id.) She also noted that Baker had agreed to withdraw his grievance "because it had already been resolved informally." (Id.)

Although Grey identified DOC Policy 150.150, which refers to visits generally, Baker has identified a DOC Policy 590.500, which is specific to attorney visits. The DOC Policy 590.500 in effect in 2019 stated that "confidential attorney visitation to discuss legal matters will be allowed" and that the "Superintendent may set reasonable limits on the time,  place, and manner of visits with legal counsel." DOC Policy 590.500 § I(D) (Dkt. No. 180 at 55). Neither Party has identified direction from the Superintendent concerning limitations. But the Parties identify conflicting information about what the standard operating procedures were for attorney visits. Grey states that "[i]t was the general practice at the time in the SOU to have someone in the visiting room when visitors came to visit incarcerated individuals for security and to help visitors with their requests." (Declaration of Kathryn Grey ¶ 5 (Dkt. No. 164).) But she cites to no documents or directive to this effect. Meanwhile, both the Law Librarian and Lieutenant explained contemporaneously to these incidents that the proper procedures at the time were to stay outside of the waiting room. (Ex. 10 to Pl. Opp. MSJ (Dkt. No. 180 at 85).) Baker has also provided a declaration from another inmate who avers that in 2019 "[t]he standard practice and procedure for attorney visits at SOU is for staff to remain outside the visit room in the vestibule so that they do not interfere with attorney confidentiality." (Declaration of Daniel J. Perez ¶ 9 (Dkt. No. 180 at 62).)

1    The Parties also identify conflicting information as to whether Crouse knew that standard

2    operating procedures required him to be outside of the room. Perez avers that Crouse knew of the

3    policy and stayed out of the room during Perez's visits with counsel during the same time period.

4    (Perez Decl. ¶¶ 6-8.) Perez's declaration directly contradicts Crouse's declaration that "I was

5    under the understanding that for the safety of visitors and how the Special Offender Unit visiting

6    room is structured, remaining in the visiting room at a far distance to ensure privacy was

7    acceptable." (Declaration of Camden Crouse ¶ 5 (Dkt. No. 163).)

8    The Parties also dispute whether there was a valid reason for Crouse, Mills, or Pratt to be

9    in the room with Baker during the attorney visits. Mills avers that "[b]ased on his past behavior,

10    it is known that Mr. Baker can become very violent, very quickly" and "[i]t is not unusual for

11    staff to be present at meetings between violence prone, incarcerated individuals such as Mr.

12    Baker and visitors to make sure the visit can be held safely for all concerned." (Declaration of

13    Sonia Mills ¶ 4 (Dkt. No. 166).) But she does not state that she had any specific concerns about

14    Baker's behavior during the visit. Nor does she state that she ever personally witnessed Baker

15    being violent. Crouse makes a similarly vague statement about Baker's purported violent

16    behavior. Parroting Mills, Crouse avers that "[i]t is known that Mr. Baker can become very

17    violent, very quickly." (Crouse Decl. ¶ 4.) Crouse states that he "was supervising the visit to

18    ensure the safety of the two individuals Mr. Baker was meeting" and that he told the individuals

19    he "was only there for their personal safety." (Id.) As with Mills, Crouse provides not personal

20    knowledge of Baker's purported violence. Crouse claims that "[t]he two individuals self-reported

21    to me that it was fine for me to remain int eh room and thanked me for staying in the room

22    during the visit." (Id.) Baker has not submitted any declarations from his attorneys who were

23    present.

24

1    The Court notes that aside from Crouse's and Mill's declarations, there is no evidence of

2    Baker's purported violent tendencies. Defendants point to a portion of Baker's deposition where

3    he explained "I go from zero to 100 quick sometimes" due to his "injury"—which appears to

4    refer to a brain injury. (Williams Decl. ISO Reply Ex. 1 (Baker Dep. at 90 (Dkt. No. 182-1)); see

5    Ex. 8 to Pl. Opp. to MSJ (neurological assessment describing Baker's anoxic brain injury he

6    suffered in 2008) (Dkt. No. 180 at 70).) But Defendants have not pointed to any evidence of

7    Baker's violent tendencies, such as his prison history. And Baker himself avers that he has no

8    violent prison history, with only one fight in his record. (Baker Decl. ¶ 15.)

9                                                    **ANALYSIS**

10   **A.    Legal Standards**

11          When a party objects to any portion of the Magistrate Judge's Report and

12   Recommendation, the District Court must make a de novo determination of that portion of the

13   Report and Recommendation. See 28 U.S.C. § 636(b)(1)(B); Dawson v. Marshall, 561 F.3d 930,

14   932 (9th Cir. 2009). The Ninth Circuit has determined that "a district court has discretion, but is

15   not required, to consider evidence presented for the first time in a party's objection to a

16   magistrate judge's recommendation." United States v. Howell, 231 F.3d 615, 621 (9th Cir. 2000).

17          Given that this matter comes before the Court on Defendants' Motion for Summary

18   Judgment, the Court reviews the applicable standard under Federal Rule of Civil Procedure 56.

19   Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file,

20   and any affidavits show that there is no genuine issue as to any material fact and that the movant

21   is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue

22   of fact exists, the Court must view all evidence in the light most favorable to the nonmoving

23   party and draw all reasonable inferences in that party's favor. Anderson v. Liberty Lobby, Inc.,

24

1    477 U.S. 242, 248-50 (1986). A genuine issue of material fact exists where there is sufficient

2    evidence for a reasonable factfinder to find for the nonmoving party. Id. at 248. The moving

3    party bears the initial burden of showing that there is no evidence which supports an element

4    essential to the nonmovant's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the

5    movant has met this burden, the nonmoving party then must show that there is a genuine issue

6    for trial. Anderson, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a

7    genuine issue of material fact, "the moving party is entitled to judgment as a matter of law."

8    Celotex, 477 U.S. at 323-24.

9    **B.    Baker's Kitchen-Related Claim Survives Summary Judgment**

10           The Court ADOPTS the R&R's determination that there remain genuine disputes of

11   material fact as to whether: (1) Harris falsified the basis for her infraction of Baker; (2) Harris's

12   infraction was the cause of Baker's termination; and (3) Harris acted in retaliation against Baker

13   for having filed grievances against Harris and her compatriots. The Court also ADOPTS the

14   R&R conclusion that Harris is not entitled to qualified immunity—a conclusion Defendants do

15   not challenge.

16           The R&R correctly sets forth the elements of Baker' retaliation claim:

17   A plaintiff must prove five basic elements to prevail on such a claim of retaliation: "(1)
     An assertion that a state actor took some adverse action against an inmate (2) because of
18   (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise
     of his First Amendment rights, and (5) the action did not reasonably advance a legitimate
19   correctional goal." [Rhodes v. Robinson, 408 F.3d 559, 567-568 (9th Cir. 2005)]. The
     plaintiff must also show the protected conduct was the substantial or motivating factor
20   driving the prison official's conduct. See Mt. Healthy City Sch. Dist. Bd. of Educ. v.
     Doyle, 429 U.S. 274, 286–87 (1977); Brodheim v. Cry, 584 F.3d 1262, 1271 (9th Cir.
21   2009). A court must "'afford appropriate deference and flexibility' to prison officials in
     the evaluation of proffered legitimate penological reasons for conduct alleged to be
22   retaliatory." Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995) (quoting Sandin v.
     Conner, 515 U.S. 472, 482 (1995)).
23
     (R&R at 8.)
24

1    Defendants fail to identify any basis on which the Court might grant summary judgment

2    in their favor on Baker's claim. The Court reviews the two primary reasons why.

3    First, there remains a dispute of fact as to whether Baker was terminated on the basis of

4    Harris's allegedly false infraction. Defendants argue that because both Hoskins also wrote a

5    report of the June 25th incident, "it is inaccurate for Baker to claim he was fired from his prison

6    job because of the incident report written by Harris as opposed to the incident report written by

7    Officer Hoskins." (Defs. Obj'ns at 3-4.) This argument does convince the Court that Harris is

8    entitled to summary judgment. Baker has provided evidence that both Harris and Hoskins

9    falsified reports about his disobedience and that Harris's decision to infract him was one of the

10   key reasons he was fired. That evidence itself precludes summary judgment. And based on the

11   Court's review of the record, Hoskins did not issue an infraction, but merely issued an "incident

12   report," that merely describes Baker's "disruptive behavior." (Dkt. No. 165-1 at 4.) Defendants

13   cite to no evidence that Grey based her termination decision on Hoskins' report. Even if this

14   report served as some ground for Baker's termination, it does not interrupt the causal chain

15   between Harris's purportedly false infraction report and Baker's termination. A jury has to make

16   the final determination as to whether Harris' infraction was false and whether it caused Baker's

17   termination.

18   Second, there remains disputes of material fact as to whether Harris acted out of a

19   retaliatory animus. Baker has identified evidence relevant to Harris' retaliatory intent, including

20   his March 2018 grievance against Harris, in which he alleged she terminated him from his lead

21   position in the kitchen because he had sued her friend, Jerald Grant. Baker also points out that

22   Harris was aware that he had filed a complaint against Grant, and Harris's self-serving

23   declaration states only she was unaware of the details, not the fact of the complaint. (See Harris

24

Decl. ¶ 4.) Baker has also identified Sutherland's statement that he knew Baker lost his job because Baker was "suing everybody." This evidence is relevant and probative of Harris' retaliatory animus. Defendants have attempted now supplement the record by submitting a declaration from Sutherland with their objections to the R&R. Defendants have not explained why they waited to present this evidence despite the fact they moved for summary judgment and knew of Baker's allegations concerning Sutherland's statements well before they did so. The Court finds the submission untimely and that its presentation prejudiced Baker's ability to prepare a complete response. The Court therefore STRIKES the late-filed declaration. See Howell, 231 F.3d at 621. But even if the Court considered Sutherland's declaration, it only manages to raise further disputes of fact as to whether his current testimony is credible. Sutherland states that "I do not remember these events very clear because this incident occurred over five years ago," and then professes he did not know why Baker was fired at the time or at any time later. (Sutherland Decl. ¶¶ 4-6 (Dkt. No. 196).) Baker should be allowed to probe and a jury should determine whether Sutherland's memory is reliable and whether his report is trustworthy. Additionally, Baker has shown that up until his termination, he had not received any infractions since 2013 and that he had been commended for his good work shortly before being infracted. It was only after he began filing grievances against kitchen correctional officer staff that he was terminated. Collectively, this evidence is probative of Harris' retaliatory animus. Based on this record, the Court finds sufficient material facts in dispute as to whether Harris acted with a retaliatory animus, which precludes summary judgment.

The Court finds Defendants' remaining objections inadequate to produce a different outcome. First, Defendants argue that they are entitled to summary judgment because neither of the two witnesses Baker has identified speak to Harris's retaliatory animus. This fact, however,

1    does not negate the other evidence Baker has identified of Harris's retaliatory motivation, as

2    discussed above. Second, Defendants argue that Harris could not have acted for a retaliatory

3    purpose because she did not "even know about" the lawsuit against Grant. (Defs. Obj'ns at 5.)

4    But Harris avers only that she "was not aware of the details of Mr. Baker's alleged former

5    lawsuit against Mr. Grant," not that she was unaware of the complaint. (Harris Decl. ¶ 4

6    (emphasis added).) Contrary to Defendants' briefing, Harris has not professed ignorance of the

7    lawsuit itself, which undermines Defendants' objections. Third, Defendants fail to address the

8    fact that Baker had separately filed a grievance against Harris, which is competent evidence

9    relevant to the question of her motivation to infract Baker. The Court finds no merit in

10   Defendants' objections. And the Court agrees with the R&R's qualified immunity analysis,

11   which it ADOPTS in full, particularly given that Defendants filed no objections to it.

12           In summary, the Court ADOPTS the R&R on this claim and STRIKES the late-filed

13   Sutherland Declaration. A jury must determine the merits of Baker's kitchen-job-related claim.

14   The Court notes that consistent with the R&R, the claim shall be dismissed as to Defendant

15   Grey, given Baker's failure to object to this portion of the R&R and the absence of any evidence

16   Grey ratified Harris' conduct or participated in the retaliation. (See R&R at 7 n.1.)

17   **C.    Attorney Visitation Claims**

18           Baker pursues claims that three correctional officers infringed on his First Amendment

19   right to confer confidentially with counsel and that these three individuals and Grey retaliated

20   against him in violation of the First Amendment. In assessing the claims, the R&R reasoned that

21   even if the Defendants infringed on Baker's constitutional right to meet confidentially with

22   counsel, they did so for valid penological reasons that excused their conduct. (R&R at 14-15.)

23   The Court disagrees with this final conclusion, finding that the facts remain hotly contested as to

24

1    whether Defendants had a valid reason to be in the visitation room. But before the Court assesses

2    the disputed material facts, the Court first examines whether Baker has a right to confer

3    confidentially with counsel and whether he has stated claims related to his attorney visits.

4         **1.     Right to Confer Confidentially with Counsel**

5         "In American criminal law, the right to privately confer with counsel is nearly

6    sacrosanct." Nordstrom v. Ryan, 762 F.3d 903, 910 (9th Cir. 2014) (discussing the right in the

7    context of the Sixth Amendment right to counsel). While Nordstrom explored the contours of the

8    right to meet with counsel in the context of the Sixth Amendment, the Ninth Circuit has affirmed

9    a First Amendment right not to have legal mail opened by correctional officers because it would

10   intrude on the right to confer with counsel. Hayes v. Idaho Corr. Ctr., 849 F.3d 1204, 1212 (9th

11   Cir. 2017). This same reasoning applies equally to the right to confer privately with counsel free

12   of the prying ears and eyes of correctional officers. See id. at 1211 (explaining that the Sixth

13   Amendment principles set forth in Nordstrom map to similar First Amendment rights to

14   communicate privately with counsel). Consistent with  Ninth Circuit law, the DOC regulations

15   themselves state that "confidential attorney visitation to discuss legal matters will be allowed."

16   DOC Policy 590.500 § I(D) (Dkt. No. 180 at 55). Indeed, both the MCC Law Librarian and

17   Lieutenant agreed that guards should not be in the room during attorney visitation. (Dkt. No. 180

18   at 85.) The Court therefore finds that Baker had a right to visit with his counsel free of

19   interference from the correctional officers.

20        **2.     Baker Identifies Facts Supporting his Visitation-Related Claims**

21        Baker has identified three instances where Defendants violated his First Amendment

22   right to confer confidentially with counsel. During three visits in March, October, and December

23   2019, correctional officers were in the visitation room with Baker while he met with counsel. As

24

1   Baker avers, the officers were within earshot and their presence upset him and left him without

2   the ability to speak fully with his counsel. (Baker Decl. ¶¶ 13-14, 22.) He states that he became

3   too upset to confer with counsel, and that this negatively affected the outcome of his lawsuit.

4   (Id.) It is also uncontested that once Baker filed a grievance, staff at MCC quickly agreed with

5   Baker that correctional officers should not be present during attorney visits. (Dkt. No. 180 at 85.)

6   There are therefore no facts in dispute that by having guards in the visitation room, Baker's

7   rights were infringed. And in the context of this First Amendment claim, the only injury Baker

8   need show is that "'his right to privately confer with counsel has been chilled.'" Hayes, 849 F.3d

9   at 1212 (considering First Amendment claims regarding legal mail) (quoting Nordstrom, 762

10  F.3d at 911). Accordingly, the Court finds that Baker has provided sufficient evidence to sustain

11  his First Amendment claim regarding the attorney visits as to Crouse, Mills, and Pratt.

12          Separately, Baker has also identified sufficient facts of retaliation to support his First

13  Amendment retaliation claim stemming from these visits as to Crouse and Grey. According to

14  Baker, Defendant Grey ordered Crouse to be present during the meetings in order to gain

15  information to assist Jerald Grant in the lawsuit and complaints Baker had filed. (Baker Decl. ¶

16  24.) While the Court acknowledges that this is a self-serving declaration, Defendants have not

17  identified any specific, contrary statements from Grey or Crouse, who provide only generalized

18  denials. (See Crouse Decl. ¶ 6; Grey Decl. ¶ 7.) And although Grey is alleged to be a supervisor,

19  the Court finds that her liability arises out of her individual conduct given Crouse's alleged

20  statements that Grey directed him to be present to overhear Baker's attorney visits. See Jackson

21  v. City of Bremerton, 268 F.3d 646, 653 (9th Cir. 2001) (holding that § 1983 liability applies to

22  supervisors "if he or she was personally involved in the constitutional deprivation or a sufficient

23  causal connection exists between the supervisor's unlawful conduct and the constitutional

24

violation"). So even though supervisors cannot be held vicariously liable for the acts of

subordinates, (see R&R at 7 n.1), Grey has here been identified as having personally participated

in the retaliatory acts. A jury should determine whether Crouse was present during the attorney

visits as a form of retaliation for Baker's complaints and lawsuits against Grant and whether

Grey ordered Crouse to be present.

### 3.      Disputed Facts as to Valid Penological Reasons

The Court agrees with and ADOPTS the R&R's explanation of the state of law that

"[e]ven if a prison regulation infringes upon an inmate's constitutional rights, the regulation is

valid if it is reasonably related to legitimate penological interests." (R&R at 14 (citing Turner v.

Safley, 482 U.S. 78, 89 (1987)).) But the Court finds that the facts remain disputed as to whether

the correctional officers had valid reasons for being in the room with Baker during any of the

visits.

First, Defendants have not identified any DOC regulations that permitted guards to be in

the room with an inmate during a visit with counsel. The DOC regulations in place at the time

state that "confidential attorney visitation to discuss legal matters will be allowed" and that the

"Superintendent may set reasonable limits on the time, place, and manner of visits with legal

counsel." DOC Policy 590.500 § I(D) (Dkt. No. 180 at 55). While this seemingly allows for

limits to be placed, Defendants do not identify any directives from the Superintendent that set

limitations or allowed correctional staff to be present during attorney meetings. And in response

to Baker's grievance, Defendant Grey failed to identify any specific policy that allowed the

officers to be present. (Dkt. No. 180 at 85.) At most, Grey stated she have reviewed various

unidentified policies, procedures, and RCWs, and concluded that "Policy 150.150 is vague about

staff presence during attorney visits." (Id.) Although the Court lacks the 2019 version of DOC

1   Policy 150.150, the current version of Policy 150.150 speaks only to visitation generally, not

2   attorney visits. This does not help Defendants. Moreover, contemporaneous opinions from both

3   the Law Librarian at MCC and the Lieutenant were that attorney visits did not allow for guards

4   to be present. (Dkt. No. 180 at 85 ("Miriam Dominque-Kastle, Law Librarian, and Lieutenant

5   John Richards both advised that staff should remain behind glass to observe attorney visits.").)

6   Defendants have therefore failed to identify any policy that allowed for guards to be present

7   during attorney visits.

8          Second, there are disputed facts as to whether it was standard procedure to allow

9   correctional officers into attorney visitation rooms. Baker has presented evidence that the

10  standard practice and procedure at MCC-SOU was not to allow correctional officers to be in the

11  visitation room with counsel. Baker offers a declaration from another inmate in the SOU, who

12  avers that in 2019 "[t]he standard practice and procedure for attorney visits at SOU is for staff to

13  remain outside the visit room in the vestibule so that they do not interfere with attorney

14  confidentiality." (Perez Decl. ¶ 9.) Perez also states that Crouse knew of this standard practice

15  and abided by it during Perez's visits with counsel during the same time period. (Id. ¶¶ 6-8.)

16  Perez's declaration directly contradicts Crouse's self-serving declaration that "I was under the

17  understanding that for the safety of visitors and how the Special Offender Unit visiting room is

18  structure, remaining in the visiting room at a far distance to ensure privacy was acceptable."

19  (Declaration of Camden Crouse ¶ 5 (Dkt. No. 163).) Defendants dispute Baker's evidence,

20  pointing to Grey's declaration where she states that "[i]t was the general practice at the time in

21  the SOU to have someone in the visiting room when visitors came to visit incarcerated

22  individuals for security and to help visitors with their requests." (Declaration of Kathryn Grey ¶

23  5 (Dkt. No. 164).) Construing the facts in the light most favorable to Baker, the Court finds a

24

genuine dispute of material fact as to whether it was generally permitted for guards to be in the visitation room during a confidential meeting with counsel at the time the meetings occurred in 2019.

Third, even if there was a permissive policy or standard operating procedure allowing correctional officers to be present during attorney visitations for certain inmates, the facts remain disputed as to whether it was necessary for Crouse, Mills, or Pratt to be in the room with Baker during the attorney visits. Mills avers that "[b]ased on his past behavior, it is known that Mr. Baker can become very violent, very quickly" and "[i]t is not unusual for staff to be present at meetings between violence prone, incarcerated individuals such as Mr. Baker and visitors to make sure the visit can be held safely for all concerned." (Declaration of Sonia Mills ¶ 4 (Dkt. No. 166).) But she does not state that she had any specific concerns about Baker's behavior during the visit. Nor does she state that she ever personally witnessed Baker being violent. Crouse makes a similarly vague statement about Baker's purported violent behavior. Parroting Mills, Crouse avers that "[i]t is known that Mr. Baker can become very violent, very quickly." (Declaration of Camden Crouse ¶ 4 (Dkt. No. 163).) Crouse states that he "was supervising the visit to ensure the safety of the two individuals Mr. Baker was meeting" and that he told the individuals he "was only there for their personal safety." (Id.) As with Mills, Crouse identifies no personal knowledge of Baker's purported violence. Crouse claims that "[t]he two individuals self-reported to me that it was fine for me to remain in the room and thanked me for staying in the room during the visit." (Id.) This Court accords this hearsay little weight and it does not necessarily justify Crouse's decision. Against these declarations, the Court notes an absence of evidence of Baker's purported violent tendencies. Baker himself has pointed out that he has had only one fight while incarcerated, and does not have a violent prison history. (Baker Decl. ¶ 15.)

1    Defendants have not offered any contrary evidence. Instead, Defendants submit a portion of

2    Baker's deposition where he explained that "I go from zero to 100 quick sometimes" due to his

3    "injury"—which appears to refer to a brain injury. (Williams Decl. ISO Reply Ex. 1 (Baker Dep.

4    at 90 (Dkt. No. 182-1)); see Ex. 8 to Pl. Opp. to MSJ (neurological assessment describing

5    Baker's anoxic brain injury he suffered in 2008) (Dkt. No. 180 at 70).) But this testimony is

6    ambiguous as to what Baker meant and, construing the testimony in Baker's favor, the Court

7    does not find that he was referring to violence. The Court here finds dispute of material fact as to

8    whether either Mills or Crouse had grounds to believe Baker posed any danger to any attorney

9    visitor. Additionally, the Court notes that because Pratt filed no declaration, there is no evidence

10   as to why she was in the room with Baker—a fact fatal to summary judgment in her favor.

11          Additionally, the Court notes that Crouse's declaration appears to be untrustworthy given

12   contradictory evidence Baker has identified. Specifically, Crouse claims he "was not informed

13   that Mr. Baker was meeting with his own attorneys." (Declaration of Camden Crouse ¶ 4 (Dkt.

14   No. 163).) But an email sent to Crouse just six days before the attorney meeting shows that

15   Crouse was asked to provide an escort for an "Attorney Visit[] for Jamall Baker" on December

16   12, 2019. (Dkt. No. 180 at 69.) This directly contradicts Crouse's present claim that he had not

17   been informed of Baker's visitation with his attorneys on December 12, 2019. This undermines

18   the reliability of Crouse's newly-created and self-serving declaration. A jury should resolve what

19   part, if any, of Crouse's testimony is believable.

20          Construing the facts in Baker's favor, the Court finds a genuine dispute of material fact as

21   to whether Defendants had a valid penological reason to be in the room with Baker. Baker has

22   provided sufficient evidence that these Defendants' presence impacted his constitutional right to

23

24

1   meet with counsel. The Court therefore OVERRULES the R&R on these claims and a jury must

2   determine its merit.

3       **4.     No Qualified Immunity**

4       The Court also finds that Defendants are not entitled to qualified immunity as to Baker's

5   First Amendment claims regarding attorney visits.

6       To defeat qualified immunity Baker must show: (1) the officials violated a federal

7   statutory or constitutional right; and (2) at the time of the alleged act or failure to act, there was

8   clearly established law that defined the contours of the federal right, such that every reasonable

9   official would understand that what they are doing is unlawful. City of Escondido, Cal. v.

10  Emmons, 139 S. Ct. 500, 503 (2019). When qualified immunity is reviewed in the context of a

11  defense motion for summary judgment, the evidence must be considered in the light most

12  favorable to the plaintiff with respect to central facts. Tolan v. Cotton, 572 U.S. 650, 657 (2014)

13  (per curiam). Summary judgment is not appropriate where genuine issues of material fact prevent

14  a determination of qualified immunity. Bonivert v. City of Clarkston, 883 F.3d 865, 871–72 (9th

15  Cir. 2018). And "[t]hough the constitutional right must be clearly established such that 'a

16  reasonable official would understand that what he is doing violates that right,'. . . '[t]here need

17  not be a case dealing with these particular facts to find [the officer's] conduct unreasonable.'"

18  Scott v. Cnty. of San Bernardino, 903 F.3d 943, 951 (9th Cir. 2018) (quoting Hope v. Pelzer, 536

19  U.S. 730, 739 (2002); Doe ex rel. Doe v. Hawaii Dep't of Educ., 334 F.3d 906, 910 (9th Cir.

20  2003)).

21      As the R&R correctly explained, it is clearly established law that correctional officers

22  cannot retaliate against a prisoner for exercising their First Amendment right to file grievances

23  and complaints. (R&R at 11.) The Court adopts and applies this reasoning as to Baker's attorney-

24

1    visitation retaliation claim. The Court also finds that the law has been clearly established that

2    correctional officers cannot unreasonably intrude on confidential attorney visits just as they

3    could not interfere with legal mail. See Hayes, 849 F.3d at 1212 ; Nordstrom, 762 F.3d at 911. At

4    the time of these incidents, the Ninth Circuit had clearly explained the sanctity of private

5    meetings with counsel and affirmed the right to confidential communication with counsel. See

6    id. Although Hayes spoke to interference with mail correspondence, the case left little doubt that

7    any communication between inmate and counsel must be afforded confidentiality. And while it

8    appears that Defendant Grey believed the law was unclear at the time, her own apparent

9    ignorance of the law does not give the Court pause to find the law was not clearly established.

10   Indeed, both Lieutenant Richards and Law Librarian Dominique-Kastle were quick to explain

11   that correctional officers were not allowed in the room at the time. Given that the law on both

12   claims was clearly established, the Court finds that qualified immunity cannot be granted

13   because the facts remain in dispute as to whether Defendants violated Baker's right to meet with

14   counsel privately, whether they retaliated, and whether there were any valid penological reasons

15   for their conduct. On this record, the Court DENIES qualified immunity.

16   **D.    Baker's Motions to Supplement Objections**

17         Although Baker timely filed objections to the R&R, he then filed two motions to strike

18   his prior objections and substitute them with a more comprehensive set of objections. (See Dkt.

19   Nos. 194 and 200.) Baker has explained that the medications he takes cloud his mind, that he was

20   taking these medications when he prepared both his initial and first set of objections, and that he

21   has since prepared more detailed responses. (See Dkt. No. 194 at 1; Dkt. No. 200 at 1.) While the

22   Court is sympathetic to Defendants' complaints about the late-filed objections, the Court accepts

23   Baker's supplemental objections given his pro se status and his representations concerning the

24

1   effects of his medication. And Defendants were given an opportunity to respond to the

2   supplemental objections and they have not identified any prejudice that has resulted from the

3   supplemental filings. As such, the Court GRANTS the Second Motion to File Supplemental

4   Objections and STRIKES Plaintiff's initial and first set of objections.

5   **E.      Baker's Additional Motions**

6           Baker has also filed a Motion to Consider Medical Records and a Motion to Consider

7   Additional Case Law. The Court GRANTS the Motion to Consider Medical Records, as the

8   information presented is relevant to Baker's request to file supplemental objections. But the

9   Court DENIES the Motion to Consider Additional Case Law, given that Baker has already been

10  given substantial leeway to file additional objections to the R&R.

11                                      **CONCLUSION**

12          The Court ADOPTS in part and OVERRULES in part the R&R. The Court finds that

13  genuine issues of material fact preclude summary judgment on Baker's kitchen-related claims

14  against Harris and Baker's attorney-visitation claims against Defendants Crouse, Mills, Pratt, and

15  Grey. As to these claims, the Court DENIES Defendants' Motion for Summary Judgment. But

16  the Court GRANTS summary judgment as to the kitchen-related claim against Defendant Grey,

17  and summary judgment on Baker's claims against O'Reilly, Tuggle, and McLane.

18          The Court also GRANTS Baker's Second Motion to Supplement the Objections and

19  Motion to Consider Medical Evidence. But the Court DENIES Baker's Motion to Consider

20  Additional Case Law.

21  \\

22  \\

23  \\

24

1          The clerk is ordered to provide copies of this order to Plaintiff and all counsel and

2    Magistrate Judge Leupold.

3          Dated April 1, 2024.

4

5                                              Marsha J. Pechman
                                               United States Senior District Judge
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ORDER ON REPORT AND RECOMMENDATION - 24